469 So.2d 340 (1985)
Billy R. BREWSTER, Plaintiff-Appellee,
v.
MANVILLE FOREST PRODUCTS CORPORATION, Defendant-Appellant.
No. 16926-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
*341 Shotwell, Brown & Sperry by C.A. Martin, III, Monroe, for defendant-appellant.
John S.C. Massey, West Monroe, for plaintiff-appellee.
Before HALL, SEXTON and LINDSAY, JJ.
LINDSAY, Judge.
Defendant, Manville Forest Products Corporation, appeals from the judgment of the trial court awarding worker's compensation benefits to the plaintiff, Billy R. Brewster. We amend and affirm the judgment of the trial court for the following reasons.
On September 9, 1983, plaintiff, Billy R. Brewster, was working for defendant, Manville Forest Products Corporation, as a lathe equipment operator at the defendant's plant in Lillie, Louisiana. On that date, plaintiff was working under a particle board press loader. One of the 3/8" particle boards fell from the press, a distance of approximately 20 feet. The board was approximately four feet wide and in a twenty-five foot sheet, with a total weight of 46-47 pounds. As the board fell, it broke into three pieces. One of these pieces struck plaintiff in the head and shoulder area. After being struck, the plaintiff experienced some loss of consciousness. Plaintiff went to the first aid room at the defendant's plant and then was taken by ambulance for an examination by his family physician, Dr. William Calvin Reeves. Plaintiff was later referred to an orthopedic physician, Dr. Robert Steven Bell, by the defendant. Dr. Reeves and Dr. Bell, independently of each other, released plaintiff to return to work in November, 1983. Plaintiff returned to work at that time but left after a period of several hours, complaining of pain. It appears that plaintiff has not attempted to return to work since that date. Plaintiff later consulted an orthopedic surgeon, Dr. Baer Rambach, and a chiropractor, Dr. Gerald Smalling.
Plaintiff instituted this action for worker's compensation benefits on January 26, 1984 alleging that he was disabled from performing any work. At the trial on the merits, it was stipulated that the compensation rate for plaintiff was $176.00 per week and that compensation had been paid to the plaintiff from the date of the accident through November 17, 1983. Further, all of plaintiff's medical expenses through November 29, 1983 had been paid.
Plaintiff testified he was working in the basement under the press loader when the board fell. Plaintiff testified the board hit him on the head, knocking him into a bin and then over onto his right side. Plaintiff stated that the blow rendered him unconscious. Plaintiff testified that after the accident, he had a bad headache and his back hurt. Plaintiff stated he complained to Dr. Reeves about headaches and pain in his neck and shoulder area and was given medication.
Plaintiff stated he also complained of headaches to Dr. Bell, who changed his medication. Plaintiff testified when he attempted to return to work, he was still experiencing headaches and a lot of pain in his shoulder. Plaintiff took his medication but began to feel nauseated and dizzy. Plaintiff testified he went to see Dr. Reeves after leaving work, who told him the medication may have been too strong and advised him to try to return to work the following day. Instead of trying to return to work, plaintiff testified he went to Dr. Bell. Plaintiff testified that he later consulted Dr. Rambach who wanted to admit him into the hospital for an arthrogram, a diagnostic procedure, but that the insurance company would not pay for his *342 admission. Plaintiff stated he continued to be in pain and eventually consulted Dr. Smalling. Plaintiff testified that at the date of trial, he was still suffering from neck and shoulder pain, specifically the joint area in the right shoulder, as well as headaches. Plaintiff testified that he was losing the strength in his right hand and suffered severe pain whenever he raised his right arm and shoulder. Plaintiff stated that he noticed some improvement in his neck since he had begun to see Dr. Smalling. Plaintiff stated he has not had any type of employment since the accident and his activities have been restricted to some yard work around the house.
Plaintiff testified that his education consisted of completing the eleventh grade with some limited electronics training. Plaintiff was 36 years old at the time of the trial.
Plaintiff's wife, Henry Alice Brewster, testified that after the accident, plaintiff complained of headaches, accompanied by neck and shoulder pain, as well as difficulty in sleeping. Mrs. Brewster testified that around the date of the trial, the plaintiff primarily complained about the pain in the joint area of his right shoulder and had difficulty in trying to work.
At the trial, all of the medical experts testified by deposition. Dr. William Calvin Reeves, plaintiff's family physician, stated he examined the plaintiff on September 9, 1983, after the accident. Reeves testified plaintiff was complaining of pain in his neck, back, right shoulder and head and stated he had experienced a brief loss of consciousness at the site of the accident. Reeves testified he conducted an examination of plaintiff's upper body and took x-rays, none of which showed any signs of possible fractures. Reeves stated the symptoms he found were subjective in nature and his diagnosis was a contusion of the head. Reeves prescribed medication for plaintiff and requested that he return for re-evaluation in a week. Reeves testified he saw plaintiff again on September 12, 1983. Plaintiff complained of soreness in the neck, a sore throat and an aching pain with tenderness in the shoulder blade area. On re-examination, Reeves testified plaintiff had almost a full-range of motion in his neck. Reeves prescribed anti-inflammatory medication and requested that plaintiff return in two weeks for re-evaluation. Reeves testified plaintiff returned on September 19, 1983, complaining of severe headaches and pain in his shoulders. On September 21, 1983, plaintiff returned again still complaining of severe headaches as well as intervals of confusion, which Reeves felt may have been induced by medication. On both of these dates, Reeves testified the physical examinations were essentially negative. Reeves scheduled a cat-scan of plaintiff's head and cervical spine area. The test revealed no abnormalities. On September 29, 1983, Reeves testified he saw the plaintiff and found some palpable spasm in plaintiff's left shoulder blade. Further there was some restriction in the range of motion of plaintiff's neck. On October 14, 1983, Reeves again saw plaintiff who stated that he did not feel better. At that time, plaintiff complained of headaches and of muscle spasms in his back and shoulder. Plaintiff further complained of pain in his back upon lateral bending and of pain in his neck. Reeves testified plaintiff essentially had full range of motion in his back and he recommended that plaintiff return to light work on October 24, 1983. On November 14, 1983, Reeves saw plaintiff, who complained of frequent headaches and tenderness to pressure over the shoulders. Reeves testified he released the plaintiff to return to work as he felt plaintiff was able to return to his usual occupation. Reeves stated during the course of plaintiff's visits, the only objective symptom was the palpable muscle spasm in the plaintiff's left shoulder.
Dr. Robert Steven Bell, an orthopedic physician, testified that he first examined plaintiff on October 24, 1983 and that he was complaining of neck pain, headaches and pain in his right shoulder at that time. Bell performed a complete physical examination of plaintiff's neck and upper extremities. Bell stated he found normal motion of plaintiff's cervical spine and both shoulders, *343 normal motor strength and reflexes and some tenderness in plaintiff's neck, which was a subjective symptom. Bell stated that he took x-rays of plaintiff in his office and also had tomograms (specialized x-rays) performed but that results of these were normal. Bell testified his diagnosis was cervical strain. Bell testified he told plaintiff to remain off work and to begin to resume his normal activities. Plaintiff's next visit was on November 3, 1983. Bell testified his findings at that time showed that plaintiff's range of motion of his cervical spine was normal and there were no muscle spasms present. Bell stated plaintiff did have some muscle tightness, however that was not necessarily an indication of dysfunction. Bell testified plaintiff complained of headaches but felt his neck and shoulder were improving. Bell released plaintiff to full activities as of November 7, 1983. Plaintiff returned on November 7, 1983, complaining of pain in his neck. Bell testified his physical examination revealed no objective abnormalities and he felt plaintiff did not have any permanent impairment. Bell then released plaintiff to return to work as of November 14, 1983. Plaintiff returned on November 17, 1983, stating that he was unable to work. Bell testified that his examination at that time did not reveal any changes which would alter his opinion. Bell testified his only positive findings were plaintiff's subjective complaints and all the medical testing indicated plaintiff could function normally.
Dr. Baer Rambach, an orthopedic surgeon, testified he examined plaintiff on December 5, 1983. Rambach's examination revealed that plaintiff had some tenderness around the back part of his head and his right shoulder, with marked limitation of motion of the head and neck. Plaintiff's trapezius muscles, the large muscles behind the neck which attach to the shoulder blade areas, were tender to touch. Abduction, which is bringing the arm out to the side and up, was painful and moderately restricted. Rambach testified that plaintiff's upper left extremity seemed somewhat stronger than the right although plaintiff had indicated that he was right-handed. Rambach testified that there was a glove distribution to pin prick which indicated there was an inability for plaintiff to perceive pain as normally in the right upper extremity as he could in the left. Rambach testified x-rays were taken of the skull, right shoulder and cervical spine which did not reveal anything was broken or dislocated. Rambach testified that he felt it was possible that plaintiff could have sustained an injury to the rotator cuff of the right shoulder. Rambach testified that the rotator cuff consists of several muscles which transform into leader-like structures which attach together. The rotator cuff is the location where all these leaders or tendons attach to the region of the point of the shoulder which is responsible for motions in the shoulder, primarily stabilizing and elevating the shoulder. Rambach testified that when there is a lesion or a hole in the rotator cuff, it can cause pain and interfere with motion. Rambach testified that the lesion may begin as a small tear at the time of injury and then gradually become larger in size over a period of time, thus all of the symptoms are not necessarily present immediately after the injury. Rambach suggested that an arthrogram, which is a dye test, be performed to discover whether there was a cuff lesion. Rambach testified that the corrective procedure for a lesion would involve surgery to sew the hole together, with a hospital stay of approximately four to five days. It would further entail immobilization in a specific type of splint for approximately six weeks with an additional six weeks of therapy. Rambach estimated the entire period of treatment would be approximately twelve to fourteen weeks. Rambach testified an arthrogram was scheduled but never performed. Rambach stated he did not feel that plaintiff could perform any type of physical work at the time of his examination. Although plaintiff's symptoms were subjective, Rambach testified that with most shoulder injuries, one has to rely on the subjectivity of the patient. Rambach testified he felt the restricted movement of plaintiff's head and neck were due to cervical strain but that *344 plaintiff should recover, although it could take a year or longer.
Dr. Gerald Smalling, a chiropractor, testified he first saw plaintiff on April 17, 1984. Plaintiff at that time complained of headaches, pains in his neck, right shoulder and arm and also weakness in the right arm. Smalling testified his examination revealed plaintiff had a diminished biceps reflex and weakness on the right side and experienced pain in various tests. Smalling testified plaintiff had a marked decreased range of motion of the neck and decreased feeling in the right extremity. Upon palpation, plaintiff experienced tenderness in the cervical spine area. Smalling had x-rays taken which revealed several abnormalities but no fractures in the plaintiff's cervical spine. On that date, plaintiff received physical therapy.
On April 18, 1984, Smalling conducted a thermographic diagnostic examination. Thermography, which is an objective test, detects heat or temperature changes which are associated with neurological involvement. Smalling testified that the test revealed abnormalities in plaintiff's upper right cervical area and right shoulder area. This area of plaintiff's body was reflected as a cooler area. Smalling stated that with a chronic injury, there may be a decrease in circulation which is usually directly related to a neurological decrease in that area. On that date, plaintiff received spinal manipulative therapy, intersegmental tractioning and physical therapy. Smalling's diagnosis was cervical nerve root compression and decreased range of motion of the cervical spine with the possibility of cervical disc replacement.
Plaintiff was treated on April 19, 23 and 24, 1984. Smalling testified that on April 24, 1984, plaintiff had decreased pain in the neck and in the shoulder. Plaintiff received further treatments on April 30, May 1, 2, 3, 4, 8, 9, 10, 14 and 18, 1984. Smalling testified plaintiff had definitely improved but still complained of some pain in the shoulder region. Smalling stated plaintiff had very little stiffness in the neck, with a significant reduction in pain and a reduction in the number of headaches. Smalling testified he did not feel that plaintiff could perform any heavy work requiring the use of his upper extremities, such as lifting.
The trial court reviewed the medical evidence and found the testimony of the physicians could be reconciled in light of Rambach's testimony that the rotator cuff injury may have begun as a small lesion and gradually increased, causing pain. The court found that the plaintiff established by a preponderance of the evidence that he was totally disabled as a result of the accident. The court awarded worker's compensation from the date of the last payment, for and during plaintiff's disability not to exceed a total of 450 weeks. The court further ordered defendant to reimburse plaintiff for all necessary medical expenses incurred as a result of the injuries as well as travel expenses incurred in obtaining medical services.
While the trial court did not specifically classify the plaintiff's disability as either permanent or temporary in nature, the clear import of the judgment is that the trial court found plaintiff to be permanently disabled as a result of the injury. Furthermore, the specification in the judgment of the period of 450 weeks for which plaintiff may receive compensation benefits is not in accordance with LSA-R.S. 23:1221.
On appeal, the primary issue before this court is whether the plaintiff proved that he was permanently disabled as a result of the work-related accident.
It is well-settled that the conclusions of the trial court are entitled to great weight and are not to be reversed unless manifestly erroneous. Carter v. P.K. Smith Chevrolet-Olds, Inc., 438 So.2d 655 (La.App. 2d Cir.1983), writ denied 443 So.2d 595 (La.1983) and citations therein.
After a review of the evidence, it is the opinion of this court that the trial court did not err in finding that plaintiff was disabled as a result of the accident but did err, however, in finding that the plaintiff was permanently disabled.
*345 LSA-R.S. 23:1221 provides in pertinent part as follows:
(1) Temporary total. For injury producing temporary total disability of an employee to engage in any self-employment or gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
(2) Permanent total.
(a) For any injury producing permanent total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (2)(a) of this Paragraph, compensation for permanent total disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
(c) For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (2)(b) of this Paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
A reading of the new statute which became effective on July 1, 1983, reveals that the statute placed a more stringent burden of proof upon a claimant seeking benefits for a permanent total disability. The statute requires that the claimant prove a permanent total disability by clear and convincing evidence. It does not appear, however, that the claimant's burden of proof for temporary total disability has been altered.
The testimony of the medical experts at trial clearly established that the plaintiff was, at the time of trial, disabled from performing physical labor but did not establish that this disability was permanent. There was no opinion offered as to the possible duration of this disability. As noted by the trial court, the seemingly conflicting testimony of the physicians could be reconciled based on Rambach's explanation of a rotator cuff lesion. After the trauma of the accident, the initial lesion could gradually increase over time. Thus, all of plaintiff's symptoms would not necessarily be present at the time of injury. The unrebutted testimony of Smalling established that plaintiff was disabled but that his condition was improving during the course of treatment. Further, Rambach testified that the plaintiff's condition, if he was suffering from a rotator cuff injury, could be resolved with surgery. While the testimony of Smalling and Rambach established that plaintiff was in fact disabled, there is no evidence in the record to indicate that this disability was permanent in nature so as to satisfy the burden of proof required by the statute.
Plaintiff has shown, however, that he was injured and suffered a disability which continued through the date of trial in May, 1984. The record established that the *346 plaintiff was unable to perform any physical labor or to engage in any other gainful occupation. At the time of trial, plaintiff was in a healing and recovery period, particularly since he was unable to obtain the necessary test and probable surgery due to a lack of finances and the refusal of the defendant to pay for these expenses. The evidence shows that with further testing and treatment, plaintiff will most likely recover within a foreseeable, but indefinite, period of time.
While the evidence shows that the plaintiff should recover to a point where he will be able to engage in some type of gainful occupation, at the time of trial plaintiff's condition had not stabilized and he was in need of further medical testing and treatment. Under these circumstances, plaintiff's disability would be a temporary total disability rather than permanent.
Therefore, this court finds that when an injured manual laborer is disabled at the time of trial from performing physical labor and is still undergoing medical testing and treatment with an indefinite recovery period, yet it appears reasonably certain he will be able to engage in the same or other gainful occupation within a foreseeable period of time, he is entitled to benefits for temporary total disability.
This finding of total temporary disability is subject to the rights of either party to seek a modification of this judgment pursuant to LSA-R.S. 23:1331, should plaintiff experience a change in his condition.
It has been previously held that if a total disability exists at the date of trial and is of indefinite duration, this disability must be properly classed as permanent in nature. See Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976), LeBaron v. Louisiana Pacific Corp., 434 So.2d 496 (La.App. 2d Cir.1983), writ denied 440 So.2d 758 (La.1983), Calhoun v. Fireman's Fund Ins. Companies, 437 So.2d 900 (La.App. 2d Cir.1983) and numerous citations therein.
However, it does not appear that this jurisprudence is applicable under the new worker's compensation law which has changed the definition of permanent total disability and the claimant's burden of proof thereof.
Defendant asserts the trial court erred in awarding plaintiff medical expenses incurred for diagnostic purposes only. The record indicates that plaintiff did not see Rambach and Smalling solely for evaluation purposes. Rather, plaintiff was seeking the diagnosis of and treatment of his condition. Smalling rendered a series of treatments to plaintiff and Rambach recommended a diagnostic procedure which may eventually result in surgery. Thus, these expenses incurred by plaintiff are reasonable and compensable.
In brief, plaintiff argues the trial court erred in failing to award attorney's fees and penalties. However, this issue is not properly before this court as plaintiff did not appeal the trial court judgment nor did he answer the appeal. LSA-C.C.P. Art. 2133. See also Ewing v. Trend Drilling Co., 446 So.2d 530 (La.App. 3d Cir.1984).
For the above reasons, the judgment of the trial court against defendant, Manville Forest Products Corporation, is amended to award plaintiff, Billy R. Brewster, worker's compensation benefits for temporary total disability during the period of such disability and in all other respects is affirmed. Costs of this appeal are assessed equally to plaintiff and defendant.